UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

UNITED STATES OF AMERICA                    CASE NO. 19-cr-259

VERSUS                                      JUDGE DONALD E. WALTER

MARTY JOHNSON (01)                          MAGISTRATE JUDGE HORNSBY
KEESHA DINKINS (02)

**REPORT AND RECOMMENDATION**

**Introduction**

Marty Johnson and Keesha Dinkins are charged with health care fraud, wire fraud, and paying illegal kickbacks. The charges arise out of Defendants' operation of Positive Change Counseling Agency, L.L.C. ("Positive Change") in Shreveport. Positive Change was a Medicaid provider of mental health services. The Government alleges, among other things, that Defendants falsified patient treatment records and billed for services that were never rendered.

Before the court is Defendants' Joint Motion to Suppress. Doc. 42. The motion raises issues regarding (1) whether Defendants have Fourth Amendment standing to challenge the search of Positive Change's facilities and records, (2) whether an employee of Positive Change became a government agent or confidential informant during the criminal investigation, and (3) whether the affidavits in support of search warrants for Positive Change omitted important information regarding the agents' sources. An evidentiary hearing was held on March 15-16, 2021. The credible evidence at the hearing

established the facts set forth below.  For the reasons that follow, it is recommended that Defendants' motion be denied.

## Factual Background

### The Business

Positive Change was a mental health and therapy service provider located in Shreveport, Louisiana.  Defendant Marty Johnson ("Johnson") was the owner/operator. Tr. 303.  Defendant Keesha Dinkins ("Dinkins"), a licensed pharmacist, was the business manager for Positive Change and supervised employees and staff.  Tr. 300-301.  During the relevant time frame, Dinkins was also employed as a pharmacist at Walgreens.  She went to Positive Change's office when her schedule permitted.  Tr. 51, 314.

Positive Change operated from two adjacent buildings located at 347 W. 79th Street, Shreveport Louisiana.  Tr. 61, 305.  One of the buildings was used for group therapy, transportation, and storage for older files.  Tr. 356.  It was sometimes referred to as the transportation room or building. That building was unlocked during office hours and all employees had access to it.  Tr. 62.  The second building contained the administrative offices; a sign in front of that building read, "Positive Change Counseling Agency, LLC." Neither Johnson nor Dinkins conducted any personal business affairs inside the business. Tr. 355, 358.

### Louisiana's Medicaid Program

The State of Louisiana is a participant in the Medicaid program.  The Louisiana Department of Health contracts with Managed Care Organizations ("MCOs") to manage and administer the state's Medicaid program.  The MCOs in Louisiana are Aetna,

AmeriHealth Caritas, United Healthcare, Amerigroup, and Louisiana Health Care Connections. Tr. 243-246. Entities that wish to participate in the Medicaid program in Louisiana as a provider, like Positive Change, must enter into contractual agreements with MCOs. Those contractual agreements, called "provider agreements," require the provider to follow certain rules, regulations, and procedures regarding the provision of covered services, qualified and credentialed personnel, documentation and retention, and billing practices. Tr. 245. The provider agreements also authorize the MCOs to review the records of the provider, and the MCOs can make announced or unannounced audits at any time. Tr. 245, 251.

Positive Change entered into provider agreements with the MCOs to provide covered services under Medicaid. Johnson, on behalf of Positive Change, signed contracts/applications with the five MCOs to participate in Medicaid. Tr. 251-252, 256. Over the course of about two years, Positive Change was paid several million dollars pursuant to those contracts.

Positive Change had about 12 office employees and about 30-40 field employees or contractors. Tr. 257-258. A few others, including a family member of an employee, worked after hours falsifying records to increase the amounts billed to Medicaid. Id.

**Chelsea Smith**

Chelsea Smith ("Smith") was employed at Positive Change from August 2016 to November 2017. Tr. 41, 59. She worked on treatment plans, insurance reauthorizations, and reassessments. Tr. 134. She also made sure the correct documentation was submitted

for insurance.  Tr. 30.  She had full access to all of the offices, rooms, documents, and records at Positive Change and was never told otherwise.  Tr. 134.

In the last two months of Smith's employment, there was a string of break-ins at Positive Change.  Key pads were put on some of the office doors, and bars were put on the windows.  Tr. 165, 180, 309.  Smith was told, for the first time, that she was not allowed to access the transportation room.  Tr. 135.  But there was never a time when Smith was not allowed to get patient files. Tr. 136.  In fact, there were times when she had 20 or so files on her floor as she was trying to hurry and get her work done.  Tr. 136-137.  A "file clerk" was eventually hired because employees did not return files to the file rooms located in the administrative building.  Tr. 311.  After that, files had to be checked out from the file room.

Smith had direct knowledge of the billing practices of Positive Change and was also involved in gathering patient records and related documents in preparation for any audits or documents requests by the MCOs or government agencies.  Over time, Smith became assistant program director and would help coordinate visits for "doctor day," which is when the patients could come to see a doctor.  Tr. 31.  Sherry Broussard was the actual program director, but she did not come into work regularly, so Smith also performed the duties of that position.  Tr. 32.  These duties included completing patient intake and submitting

treatment plans.  Tr. 33-34.  And on doctor day, Smith would assist with patient triage.  Tr. 35.[1]

Smith had her own office at Positive Change.  Tr. 35.  The office, located in the administration building, was designated as Office R on a diagram of the office. Defendants' Ex. 3.  Johnson's office was next door.  Tr. 50.  Johnson did not go to the office every day, and there was no evidence that Johnson locked his office door.  Tr. 313-314.

### Smith's Complaints of Fraud

On December 16, 2016 and again on January 23, 2017, Smith called the Medicaid Fraud Control Unit of the Louisiana Attorney General's Office (MFCU) and filed a complaint with the investigator on duty.  Tr. 137-138, 183-184.  She alleged fraudulent billing practices at Positive Change.  Smith alleged in her hotline complaint that Johnson was paying referral fees to individuals to use their Medicaid ID numbers and bill Medicaid for services that Positive Change did not provide.  Tr. 139.  She also stated that Positive Change was billing for transportation services that were never rendered.  Id.  Every client was billed for transportation services regardless of how they arrived at Positive Change. Id.  The duty agent asked her to send him any documents, pictures, and names of witnesses to help support her complaint.  Tr. 184, 432.  Smith did not ask to be anonymous during the calls.

---

[1] Smith's initial rate of pay was $17 per hour, but the rate increased to $21 per hour over time.  Tr. 87.

An anonymous hotline complaint was made to the United States Department of Health and Human Services, Office of Inspector General ("OIG") on December 13, 2016. Tr. 222.  That complaint was later routed to Special Agent Steven Cooper ("Cooper") with OIG.  Based on some preliminary assessments, Cooper contacted MFCU to ask if they had any information related to Positive Change.

On February 15, 2017, MFCU opened a case on Positive Change based on complaints received alleging fraudulent billing practices in January and February 2017. Investigator Erin McAlister ("McAlister") with MFCU was assigned to the case.  Tr. 198. There were three complaints with Smith's name on them, but there were also complaints from several others, including former patients and other former employees.  Tr. 199-200, 263, 273, 380, 392.

On February 17, 2017, Smith made an additional complaint call to the MFCU hotline. Tr. 140.  She asked to remain anonymous during this call.  Tr. 141.  Smith made a complaint through the hotline about inappropriate billing practices at Positive Change. Smith alleged that Johnson ordered Positive Change employees to create fraudulent documents in preparation for audits.  Smith further alleged that Johnson threatened to terminate employees if they did not comply with his demands.

After reviewing the complaints discussed above, Agent McAlister conducted a telephone interview with Smith on February 28, 2017.  Tr. 141.  During this interview, Smith alleged that Johnson and others billed Medicaid for counseling and transportation

services that were not rendered.  McAlister did not request or instruct Smith to provide any documents during this interview.

Smith met with Agent McAlister and Agent Cooper at a public library on March 24, 2017.  Tr. 144.  During this interview, Smith discussed the fraudulent activities at Positive Change.  Tr. 145, 207.  She also provided the names of employees that she believed would be willing to speak with investigators.  Smith did not provide any documents.  Tr. 217. Neither McAlister nor Cooper ever asked Smith to provide any documents or record any conversations.  Tr. 146, 163.

On June 18, 2017, Smith met briefly with Cooper at a gas station.  Tr. 147.  During this meeting, Smith provided Cooper with some examples of cut and pasted counselor notes.  Tr. 147.[2]  Smith advised that the documents she provided Cooper were prepared at the direction of Johnson in anticipation of MCO audits.  Tr. 89-90.

On July 17, 2017, Smith again met with Cooper and McAlister at the library for another interview to clarify some previously discussed issues.  Smith explained the practice of "cutting and pasting" to create false counseling notes.  Tr. 150-11.

At some point during the summer of 2017, AmeriHealth made an unannounced audit visit to Positive Change.  Tr. 158.  Smith did not call AmeriHealth to request the audit. However, in an email to McAlister, Smith stated that "an unexpected on-site audit would reveal a lot."  Tr. 160, 219.  Prior to the audit, Smith sent McAlister a list of client files that should be examined during the audit because those files had no progress notes.  McAlister

---

[2] The investigators are exempt from HIPAA.  Tr. 210.

provided that list to AmeriHealth.  Tr. 227.  Some of those client names were already on AmeriHealth's randomly selected list of files to be reviewed.  Id.

During that audit, Smith spoke to one of AmeriHealth's inspectors and reported that "everything was okay."  Id.  This was a lie Smith told because Dinkins was in the next office and could hear what was being said.  Tr. 160-161, 230.  After the audit was done, Smith immediately called McAlister and reported what happened.  Tr. 161.

In November 2017, Cooper interviewed Smith to confirm that fraudulent and false billing documents were still located on the Positive Change business premises.  Tr. 151-152.  Smith told Cooper that the conference room in Positive Change was used like an assembly line for the cutting and pasting of client notes.  Tr. 152.  Smith did not provide any documents to Cooper other than a personally hand-drawn map of the office.

In addition to interviews with McAlister and Cooper, Smith communicated via email with McAlister from March 2017 to June 2017.  Tr. 154.  The email communications were predominantly initiated by Smith.  In the emails, Smith described what she heard and saw while working at Positive Change.   Smith also sent McAlister audio recordings that Smith had recorded.  McAlister did not request any of the documents or recordings that Smith emailed. Tr. 155, 283.   In fact, McAlister told Smith not to make any more recordings that might put Smith in jeopardy.  Tr. 213-215.

At least one AmeriHealth document referenced a "confidential informant" who provided information that led to the decision to conduct the on-site audit.  Tr. 224. McAlister did not know who that was.  Tr. 274.  In McAlister's view, Smith was not a CI. She was never signed up as a CI and was not asked by McAlister or Cooper to obtain

documents or recordings.  Tr. 289-290, 372-373.  She did so on her own as a concerned citizen and employee of the business.  The agents had no control over how AmeriHealth or others referred to Smith in their communications or writings.

On December 12, 2017, Smith filed a False Claims Act qui tam action in this court against Positive Change.  Defendants' Ex. 15; Smith v. Positive Change, 17-cv-1607.  She prayed for an award of treble damages and attorney fees based on claims that Positive Change defrauded the government through false Medicaid and Medicare billings.

**Search Warrants**

Federal search warrants were authorized by the undersigned for the search of both Positive Change buildings.  Shortly before the search warrants were executed, Smith became worried about getting paid or finding a job.  She emailed Cooper and asked if she could get unemployment or $13,000 in overtime before Positive Change's bank accounts were frozen.  Cooper stated that he would call her to discuss, but he never did.  Tr. 451.

The warrants were executed on Positive Change's premises on November 30, 2017. Tr. 280.  Leading up to the warrant, McAlister and Cooper conducted 23 or 24 interviews of former patients or employees.  Tr. 392-393.  All of those people corroborated the false billing practices.  Tr. 281.  Indeed, when the search was executed, employees of Positive Change were in the conference room cutting and pasting to create false documents.  Tr. 413.  The agents saw "stacks" of templates for "mass production" of false records.  Tr. 474.

Agents removed 40 boxes of documents, including one box from Johnson's office and two and a half boxes from Dinkins' office.  Tr. 414-415.  Seven computer hard drives were removed, including a drive from a relatively new computer in Johnson's office and

two hard drives in Dinkins' office.  Tr. 416.  None of the offices or the conference room were locked when the agents arrived.  Tr. 455.

## Law and Analysis

### Standing

Defendants argue that the evidence obtained in the search of Positive Change should be suppressed because Smith was a *de facto* government agent or confidential informant when she provided Positive Change documents to McAlister and Cooper.  The Government responds that Johnson and Dinkins lack standing to challenge the search of Positive Change's premises and property, except as to the three boxes and three computer hard drives seized directly from their personal offices.

The Fifth Circuit considers the following factors in determining whether an owner or corporate officer has standing to raise a Fourth Amendment violation involving a separate legal entity: (1) where the searched information was stored (personal versus corporate storage); (2) whether the documents seized were prepared by the defendant; (3) whether the defendant was on the premises at the time of the search; and (4) whether the search was directed at corporate activity generally as opposed to the corporate officer personally.  United States v. Bush, 582 F.2d 1016, 1019 (5th Cir. 1978); United States v. Britt, 508 F.2d 1052, 1055–1056 (5th Cir. 1985).  These factors inform the ultimate issue of whether there exists a "nexus between the area searched and the workspace of the defendant."  Britt at 1056.

A careful consideration of those factors shows that Defendants have not established standing to challenge the search and seizure of the LLC's documents, files, templates,

binders, and computers. First, the vast majority of the files and records were possessed by Positive Change rather than by Defendants in their personal offices. Cooper testified that, of the forty boxes of records and seven hard drives taken from Positive Change, only three boxes of records and three computer hard drives were seized from Johnson and Dinkins' offices. Tr. 415. Cooper further testified that only a relatively small number of files were taken from Johnson's office, and Johnson's computer hard drive was relatively new with not much data on it. Tr. 415–416.

Cooper testified that the search of Dinkins' office revealed employee files and MCO records. Tr. 415. Furthermore, the data on Dinkins' two hard drives related to the business of Positive Change. Tr. 416. According to Dinkins, she kept MCO contracts, employee and payroll documents, and Positive Change's tax documents in her office. Tr. at 315–16. The only personal papers that Dinkins kept were on one of her computer hard drives, which consisted of tax documents and bank statements. Tr. 316.

Virtually all of the files, documents, and templates were found in the main building's file room and conference room and in the transportation building's overflow file area. Tr. 307, 331, 414, 452–53. Dinkins testified that she did not store patient files in her office or on her computer, and she did not have a key to access the transportation building.[3] The other records seized were removed from employee offices and common areas. Accordingly, the location of the items seized does not favor Defendants' standing argument.

---

[3] Defendant Johnson did not testify at the hearing.

Second, the patient files were created by employees of Positive Change rather than Defendants.  Dinkins was responsible for bookkeeping, paying bills, and running payroll. She did not meet with patients or generate patient files.  Tr. 178-179, 301.  She testified that the patient files were generated by the clinical side of the company, where her role was circumscribed to administrative duties.  Tr. 303-304.  Dinkins also testified that she did not own any of the cut-and-pasted patient files.  Tr. 338-339.  These facts also do not favor Defendants' standing argument.

Third, Johnson and Dinkins were not present at Positive Change when the agents arrived to begin their search.  Dinkins arrived later after someone called her.  Tr. Vol. 327. Johnson was never present during the search.  These facts also do not favor Defendants' standing argument.

Finally, Positive Change is a limited liability company and distinct legal entity. La. R.S. 12:1304(C) and 12:1329.  The agents' search was not directed at the personal records of Defendants that were located in their individual offices.  While Dinkins identified personal financial documents located in her personal office or on her computers' hard drives, she did not identify any personal effects that were seized from other areas of the premises.  This final factor also does not favor Defendants' standing argument.

In United States v. Britt, supra, the Fifth Circuit found that the defendant, who was the corporation's president and partial owner, lacked standing to challenge the search of the corporation's premises.  508 F.2d at 1053, 1055-1056.  The agents searched several buildings consisting of the corporation's premises and seized corporate records, including invoices and distributor lists.  The court found that the defendant failed to demonstrate a

nexus between the searched area and his workspace because the documents seized were normal corporate records not prepared personally by him, the area searched was a storage area that he did not work in, and the search was not directed at him but at corporate activity generally.  Id.

In United States v. Bush, supra, the Fifth Circuit found that the defendant, who was a corporate officer, lacked standing to challenge the search of the corporation's warehouse. 582 F.2d at 1018.  The agents searched the warehouse and seized obscene films. The defendant failed to demonstrate a nexus between the searched area and his workspace because he was not in the warehouse during the search; the corporation, rather than the defendant, had the requisite interest in the films because they were sent to the corporation; and the search was directed at general corporate activity rather than the defendant.  Id. at 1018-1019; see also Williams v. Kunze, 806 F.2d 594, 599-600 (5th Cir. 1986).

The Fifth Circuit has found that a corporate owner or officer had standing to challenge the search of the corporation's property when there was a close personal nexus between the corporate official and the items searched and seized by law enforcement.  In United States v. Henzel, 296 F.2d 650 (5th Cir. 1961), the Court found that the defendant, who was the sole shareholder and president of a corporation had standing to challenge the search of his personal office, where most of the corporate books and records were found. Defendant was president of the corporation, had prepared much of the material seized, and he kept the seized materials in his office where he spent the greater part of an average working day.  Id. at 653.

Those facts are distinguishable from the facts in this case.  At issue here are 37 boxes and four computer hard drives seized at Positive Change from common areas and storage rooms outside Defendants' offices and private work areas, and the materials were not personally prepared by Defendants.  Moreover, the search of Positive Change's premises was directed toward its corporate activities rather than the personal activities of Defendants.

The nature of Positive Change's business and its participation in the heavily regulated Medicaid program further supports the undersigned's finding of no standing.  A provision of the Code of Federal Regulations, 42 C.F.R. § 431.107(b), sets forth requirements for state Medicaid plans.  It requires, in part, an agreement between the Medicaid agency and each provider to: "(1) Keep any records necessary to disclose the extent of services the provider furnishes to beneficiaries; [and] (2) On request, furnish to the Medicaid agency, the Secretary, or the State Medicaid fraud control unit … any information maintained under paragraph (b)(1) of this section and any information regarding payments claimed by the provider for furnishing services under the plan."

Johnson signed a provider agreement for each of the five Louisiana MCOs and thereby gave his written consent for announced and unannounced inspections of Positive Change's premises for patient files and other information.  Tr. 251-256.  The Medicaid regulations and disclosure requirements, Johnson's consent to searches of patient files, and Johnson and Dinkins' knowledge and expectations that the patient files would be disclosed to the MCOs and government preclude any subjective or reasonable expectation of privacy in those records.  See United States v. Chuang, 897 F.2d 646, 650-51 (2nd Cir. 1990)

(president of a family-owned bank lacked any privacy interest that is objectively reasonable in bank documents because the heavily regulated nature of the banking industry diminished his expectation of privacy and the documents were not found in his personal office); United States v. Brock, 2007 WL 540791, at *17-18 (E.D. Tenn. 2007) (warrantless search by the Tennessee MFCU of a clinic for Medicaid-related records was reasonable because the Medicaid program is a closely regulated industry, government had a substantial interest in eliminating fraud in the program, search was limited in scope, and defendants had notice that such searches were sanctioned under the regulatory regime and their provider contracts).

Defendants also argue they have standing based on a theory of trespass.  Under the Fourth Amendment, a defendant "can establish [a] personalized interest" based on the "physical intrusion of a constitutionally protected area" or the violation of a "reasonable expectation of privacy … in the place searched."  United States v. Beaudion, 979 F.3d 1092, 1097 (5th Cir. 2020).  However, the test for standing "is both defendant and place-specific: it requires that a *particular* defendant (the suppression movant) have a property or privacy interest in a *particular* place (the area searched)."  Id.  Accordingly, Defendants lack standing even if the search of Positive Change is analyzed as a trespass because Positive Change, not Defendants, had the property or privacy interest in its commercial premises, common areas, and records.

Accordingly, Defendants lack standing to challenge the search and seizure of all of the records and computer hard drives that agents seized from areas outside of their

respective personal offices.  Defendants have standing only for the contents of the three boxes and three computer hard drives seized from their individual offices.

**Government Agents**

If a private party wrongfully conducts a search or seizure of another's person or property, the Fourth Amendment is not violated, and the private misconduct does not deprive the Government of the right to use the seized material as evidence.  Walter v. United States, 447 U.S. 649, 656 (1980).  The question in this case is whether, in view of the circumstances, Chelsea Smith acted as an instrument or agent of the Government when she gathered the material that she turned over to the Government.  Coolidge v. New Hampshire, 403 U.S. 443, 487 (1971); United States v. Blocker, 104 F.3d 720, 725 (5th Cir. 1997).  If she was acting as a government agent, the material may be subject to suppression.

To determine whether someone is a state actor or government agent under the Fourth Amendment, courts examine whether the (1) government knew or acquiesced in the intrusive conduct; and (2) private party or actor intended to assist law enforcement or to further her own ends.  United States v. Paige, 136 F.3d 1012, 1017-1018 (5th Cir. 1998). As to the first factor, there is no evidence that McAlister or Cooper acquiesced in any intrusive conduct.  They did not direct Smith to do anything.  The documents Smith provided were removed from areas where she had ready access.  *There is no evidence that Smith ever entered Johnson's or Dinkins' offices*.  The recordings Smith provided where not requested by the agents; in fact, the agents told her not to do that anymore for her own safety.

Defendants argue that neither Agent Cooper nor McAlister specifically instructed Smith to cease providing documents or information. However, McAlister did tell Smith to stop recording conversations at Positive Change for her own safety. Tr. 213. And even if the agents did acquiesce with Smith providing documents and information to them, *Smith's conduct was not intrusive*. The documents and information Smith provided were within the scope of her job responsibilities at Positive Change. Smith had access to patient files and billing records at Positive Change as part of her daily job responsibilities and duties. Tr. 325. There is no evidence that Smith went into the Defendants' personal offices at Positive Change to remove documents or any of Defendants' personal documents or records.

Moreover, in United States v. Jenkins, 46 F.3d 447, 460 (5th Cir. 1995) the Fifth Circuit explained that agency is irrelevant if the private person's conduct did not violate the Fourth Amendment. There, the court stated that "[i]n other words, becoming an 'agent' for purposes of the Fourth Amendment does not terminate one's right to engage in conduct which was authorized prior to entering the agency relationship." Id. Here, Smith had, with consent of her employer, complete access to the documents, records, files, binders, and other information in question as part of her daily job duties. Smith's access to the Positive Change patient files and billing related documents was not triggered by her interactions with law enforcement.

Regarding the second factor, Smith clearly intended to assist the agents by providing fraudulent billing related documents and related information. She readily met with the agents and provided information to them. But the court finds that Smith's other motive

was to further her own interests by gathering information necessary to support her qui tam case, which was filed within a month of the execution of the search warrants.

Smith testified that she was not asked to be a confidential informant. Tr. 143-144, 147, 148, 163. Cooper and McAlister testified they did not treat or classify Smith as a confidential informant. Tr. 268, 372. Smith was never offered or provided with any payment or other consideration for her cooperation. Tr. 268, 376. The investigative reports did not refer to Smith as a CI and her identity was not concealed. Gov. Ex. 7. At the hearing, Agent Cooper explained that he did not seek authorization to designate or treat Smith as a CI because she was not a CI.

Defendants point to the memorandum from AmeriHealth wherein it referenced a "confidential informant." However, AmeriHealth is a private entity rather than a law-enforcement or government agency. The agents had no control over AmeriHealth's erroneous mischaracterization.

For these reasons, the court finds that Smith was not a government agent within the meaning of the law. And in the alternative, her actions did not violate the Fourth Amendment because she had access to the information provided.

### The MCOs as Government Agents

Defendants argue that AmeriHealth was acting as a government agent when it conducted regulatory audits at Positive Change, and that McAlister inappropriately influenced AmeriHealth's audit. The Government responds that the evidence recited in the affidavits to support the search warrants for the Positive Change business premises was

independent of information gleaned from the AmeriHealth audit.  The testimony at the hearing supports the Government's argument.

Agent Cooper prepared the search warrant applications, and he credibly testified that he had no interactions with any MCOs as part of the criminal investigation of Defendants.  Tr 389-390.  He also testified that none of the information from any MCO audit was used for the applications for the search warrants.

Agent McAlister testified how it was in the normal course of her duties to communicate with MCOs when she is assigned a case involving alleged billing fraud.  She also explained how the MFCU and MCOs share information when they are investigating common providers.  Tr. 246–251.  Furthermore, AmeriHealth opened an investigation into Positive Change's billing practices in March 2016, about one year before McAlister opened the case against Positive Change in February 2017.  Tr. at 262.  All she did was suggest an unannounced audit (which Johnson already agreed to in the Provider Agreement) and some more patient names for AmeriHealth to review.

Defendants argue that Blocker, supra, frowns upon law enforcement's influence on regulatory audits.  Defendants state that AmeriHealth was acting for the agents in suggesting an unannounced audit and adding patient names for audit purposes. AmeriHealth did add six of the nine patient files that McAlister suggested they examine. Three of the patient files suggested by McAlister were already on AmeriHealth's list.  But adding names did not exceed AmeriHealth's regulatory and statutory authority.

Defendants argue that the Government agents improperly influenced AmeriHealth to conduct an unannounced audit. Agent McAlister testified that she corresponded with

AmeriHealth before the audit.  However, McAlister testified credibly that she did not suggest AmeriHealth conduct an unannounced on-site audit.  Tr. 226-228.

As in Blocker, this case is not a situation where the agents "trumped-up" a phony audit to covertly examine the records.  Blocker, 104 F.3d at 727.  It must be emphasized that Positive Change was in the highly regulated and frequently audited business of providing mental health services through Medicaid.  Positive Change was audited regularly, and Positive Change agreed to the very type and scope of audit that was conducted by AmeriHealth.  Therefore, the MCOs were not state actors or government agents under the Fourth Amendment.

**Actual Authority**

Defendants also argue that Smith's role at Positive Change did not instill her with actual or apparent authority to provide documents to the agents.  The undersigned disagrees.  Under the Fourth Amendment, a person has authority to consent to the seizure and or search of property if they have access to and control of the property.  United States v. Iraheta, 764 F.3d 455, 463 (5th Cir. 2014); United States v. Staggers, 961 F.3d 745, 760 (5th Cir. 2020).  Smith testified how her duties and responsibilities at Positive Change required her to have access to patient files, billing records, and other related documents.  Smith also established that Johnson or Dinkins never questioned, limited, or restricted her access to such files or documents.  Even Dinkins admitted that Smith needed constant

access to the records to do her job.  Tr. 325.[4]  Therefore, Smith had actual authority to access and provide the documents to the agents.

**Apparent Authority**

Apparent authority exists when law enforcement has reasonable grounds to believe that the person providing consent to search has the actual authority to do so.  Illinois v. Rodriguez, 497 U.S. 177, 186 (1990); United States v. Freeman, 482 F.3d 829, 834 (5th Cir. 2007).  Cooper and McAlister testified about Smith's extensive knowledge about Positive Change's billing practices and procedures.  Tr. 265-266, 371.  Smith also discussed the particulars of the scheme to defraud and the Defendants' roles therein.  Tr. 150-151.  Throughout Smith's interactions with Cooper and McAlister, Smith remained employed at Positive Change, and her job responsibilities required her to have constant access to the patient files and billing records.  Under these circumstances, a reasonable agent would believe that Smith had the actual authority to provide the documents to law enforcement.

**<u>Franks</u> hearing**

In their pre-hearing and post-hearing filings, Defendants ask the court to hold a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1979).  Defendants argue that the court was misled by the search warrant applications because neither affidavit disclosed the extent of Smith's cooperation with the agents or that Smith had a many-years-old bench

---

[4] Defendants argue that Smith's complaint to the MFCU vitiated her authority at Positive Change.  That argument is not persuasive.  The law should encourage employee complaints of fraud in Medicaid programs, not discourage them.

warrant for her arrest for fighting.  Tr. 436-437, 440.  Another source mentioned in the affidavits was "S.R."  The affidavits did not disclose that she had a prior conviction for bank fraud. Tr. 436.  Defendants' Joint Post-Hearing Brief, Doc. 72, pp. 15-16.  There was no evidence whether the bench warrant for Smith was satisfied or still active.

To prevail on a Franks claim, Defendants must show (1) a false statement was included by the affiant in the warrant affidavit either knowingly and intentionally, or with reckless disregard for the truth, and (2) the allegedly false statement is necessary to a finding of probable cause.  See United States v. Sibley, 448 F.3d 754, 758 (5th Cir. 2006).  If a defendant does not make a substantial preliminary showing of the Franks elements, the court may decline an evidentiary hearing and deny the defendant's claim.  Id.

Defendants do not meet the Franks threshold.  Agent Cooper's description and recitation of the evidence in the affidavits, particularly regarding Smith's role, was accurate.  Agent Cooper did not engage in intentional or reckless misconduct regarding the information and facts recited in the affidavits.  Failure to disclose criminal histories of Smith or others was of no moment in light of the abundance of probable cause set forth in the affidavits.  In any event, if the alleged disputed portions of the affidavits were excised, sufficient probable cause would still exist to support the search warrants.  Therefore, Defendants' request for a Franks hearing should be denied.

**Conclusion**

Accordingly,

It is recommended that Defendants' Joint Motion to Suppress (Doc. 42) be denied.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Crim. P. 59(b)(2), parties aggrieved by this recommendation have **fourteen (14) days** from the date of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Crim. P. 45(b).  A party may respond to another party's objections within **fourteen (14) days** from the filing of the objections. Counsel are directed to furnish a paper copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file timely written objections to the proposed findings, conclusions and recommendation set forth above shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 6th day of August, 2021.

Mark L. Hornsby
U.S. Magistrate Judge